That is Olibas v. Barclay, Native Oilfield Services. And we're here for Mr. Moore, representing Barclay. Good morning, Your Honors. May it please the Court. I'm Chris Moore. I am here on behalf of the appellant in this Fair Labor Standards Act case. The appellant's actually Mr. John Barclay and Native Oilfield Services. This was a collective action involving several sets of employees. What we're here about today are the driver employees. The drivers were a class of workers who transported natives. Basically, the natives' business was to transport sand for the hydraulic fracturing industry, which helps produce oil and gas out of unusual shale oil. This is a consolidated, they call it a consolidated action in Fair Labor Standards. Is that right? That's correct. And not a class action that's not subject to Rule 23? Well, yes, it's actually a collective action, not consolidated. It was consolidated at one point with... Collective, right. Correct. Sorry, I misunderstood the question at first. But, yes, it's collective. It's not subject to the Rule 23 requirements under the federal rules. So these drivers, which was, this was the business of Native Oilfield Services, was to drive sand to customers. And at the bottom of this case is the error by the judge in not granting natives judgment, a motion for judgment as a matter of law, during the course of trial and after the verdict. On what grounds? The grounds that... What is the specific error of the judge? The specific error of the judge was to reject the admissions by the plaintiffs that native engaged in interstate commerce. That is really the only issue here in this case, is was there interstate activity? And... I mean, that's not the only question, really. Was there interstate activity? There's no question there was interstate activity. My point exactly. But was there interstate activity sufficient to entitle him to claim the motor carrier exemption to overtime? That's the question. And that's, I mean, there's no question. He's in interstate commerce, the trucking company is. This is a completely different question. That's whether his drivers and his drivers alone are entitled to the exemption under the Interstate Commerce Act or the Motor Carrier Act. You're right. And whether they're subject to the Motor Carrier Act exemption is a result of whether they're engaged in interstate activity, okay? If they're... But the drivers are. That's correct. There's two different prongs. The first is the employer engaging in interstate activity. I don't think there's a question about that. The plaintiffs themselves admitted that. The next question then would be does the employee belong to a class of individuals whose class of work affects safety in interstate transportation? And the answer here is a resounding yes. Except the jury found otherwise. Well, and there's a reason for that. And that's because the jury wasn't properly instructed, which I'll get to later. You're talking about that one example the judge gave in the instruction? That is an example, yes. But the judge did not give the full instruction and should not have had to instruct the jury on this issue because of the admissions of the plaintiffs about the activities of themselves and the class of people that they belong to. And that's the key question. What would have been very helpful in this action would have been if there had been driver's logs and timesheets and items of that matter. And I understand from the briefs that your client destroyed the logs and some other documents. Is that correct? I think destroyed might be a little... Don't say think. Did they destroy the documents? Yes or no? Those documents were not produced. They were maintained primarily by a third party. They were not destroyed. There was no exfoliation issue here. Well, why weren't they at trial? Why didn't you produce them in discovery? The retention period, and this comes up in these Motor Carrier Act cases almost every time, the retention period for those kinds of documents under DOT regs, which these drivers follow, is six months. And so by the time these actions get filed, you've already lost two and a half years, potentially, of relevant documentation. But let me address that point a different way. That doesn't matter because that's not the only way that you can prove the Motor Carrier Act exemption. It's not just whether documents exist. It's whether there's interstate activity and did this employee belong to a class that affected safety and interstate transportation. Well, but there's also a question of regularity and whether the interstate efforts driving on the part of the drivers was an irregular, unexpected activity, not expected of everyone else, and your records would have helped. And the fact that you don't have records may well be your demise. If it is, we have to accept that. I'll grant you that, but I have a different response to that, and that is courts, including this one, in the Allen case, I submitted a 28-J letter to the court about a case last week that came out of the Eighth Circuit. The regularity is just a factor. What's more important is, is there a reasonable expectation? And this is the biggest point of all. In the Allen case, which I represented the defendant in that case before this Fifth Circuit, in the Songer case, which came out a few years before the Allen case, it's clear that even if you have no interstate activity by a specific individual, as long as they belong to a class who could be called to go interstate and act and affect safety and interstate transportation, that's enough. We don't need to – Well, Counsel, obviously the point you haven't gotten to yet is the voluntariness of it here, which seemed to be central to the ruling that we're facing. What about that? Do you have any case in which the drivers had a choice, they weren't going to be fired, and there's contested evidence on that, I think, in this case, but if it were truly voluntary, that the exemption applies? I don't have a case, but I will address that point. The indiscriminate assignment is but one of seven factors, and voluntariness doesn't even go necessarily to that factor. The fact that someone is asked – and let me illustrate it this way. When you have a group of drivers, in the cases where there have been found to be no exemption applied, you have a group of drivers who only does intrastate activity and the rest of the drivers do interstate activity. Or you have a group of drivers who operate on fixed routes, selling Tom's snacks to various gas stations along the way. Those are the situations where you have this issue about indiscriminate assignment, is when you have a group of people who only get one kind of work. That's not the case here. The record bears that out. Being asked to go interstate and carry this frac sand in an 80,000-pound truck is itself indicative of belonging to that class of employee. If you say no, it might come back to you. You might get assigned that. Well, Counsel, it seems to me the cases you're talking about, and you'll certainly correct me, have to deal with whether, despite that there's indiscriminate assignment, this law of averages, whatever else, some of the drivers don't actually participate. Proof shows did not actually participate in interstate commerce. Here we have the opportunity, as shown by some of the evidence, for drivers to say, no, not me. And that seems to be two different things. One is the law of averages, and it's good enough for the class. As a general rule, drivers could be expected to go in interstate commerce. Here, a driver who doesn't want to travel interstate commerce would not expect to travel interstate commerce. Well, it's not the driver's expectation that matters. It's the company's expectation. Does this class of drivers, could they reasonably called upon to travel interstate? It's not the employee's ability to refuse that. Well, I mean, that is evidenced by your employer's attitude here that they testified to. I mean, the evidence was referred to in the briefs. That's all I read. I read just the briefs. I mean, that the employer did not expect every driver, did not require every driver to do that. Is that, I mean, the jury heard all that. You may have contested what you were saying. You may have put, owned evidence like that, but that was a jury question, was it not? There was evidence of that, and there were two witnesses that spoke to it. Mr. Freddie Lee, who was a disinterested dispatcher, who also testified about the interstate activity, by the way, and Mr. Barclay, who both testified that they would try to seek volunteers. I mean, that's what employers do is try to work with their employees and get this. If they can get a volunteer, great. If not, then it has to be assigned. And Mr. Lee testified that he would just take the next seven or so people, and if he had seven jobs, he would assign them to it, regardless of whether it was interstate or intrastate activity. And it never got to the point that there was discipline required. But wasn't there evidence on the other side? I mean, the drivers themselves saying they were not required to it and they didn't have to go if they didn't want to go. The drivers did repeat the word voluntary a lot, yes. And the jury heard that. The jury heard that. And the jury ruled against you. That doesn't mean that they're not part of a class of employees that could be expected to go interstate carrying this frac sand. Isn't that a factual question? I mean, at least a fact and law question. And the law is determined by the facts, and the facts were determined against you by the jury. I mean, you just – I mean, the way it appears to me in the briefs, I mean, you can convince me otherwise. Well, the problem with that is, as Judge McBride stated in the Songer case at the district court level, is relying exclusively on this indiscriminate nature to analyze whether the MCA exemption applies. Okay? He said that shouldn't be the case. And, in fact, there's six other factors here that we – that the record shows is incontrovertibly proven. They haven't even addressed whether we proved those or not. I mean, I didn't look at it that way, and maybe I'm wrong. But, I mean, one of the factors was that you regularly – that the drivers regularly went interstate. That's one of the factors, not a determinancy factor, but that they regularly did. And there was no indication from the briefs that that regularly occurred. I mean, it was very rare that they, relative to the entire body of work that the drivers did, that they went interstate. It's always intrastate. Two responses to that, if I could. First, Mr. Barclay did testify at trial that at least 10% of the revenue of this company was based on interstate transportation. That's all they do. That's the only way they get paid is by driving things to their customers. So that does prove. And, secondly, there have been cases – like I said, Songer is one of them, and Allen is one of them – drivers who never went interstate, ever. Never crossed a state line, never had – never were even asked to or actually exempt under this exemption. So it's not quantity, it's – Well, I mean, if he could have shown that. I mean, if he could have shown that he regularly delivered goods that were shipped interstate, and he was just the last lag of the delivery, that would be an interstate exemption. But he didn't show that. I'll beg to differ on that in terms of the record as well. Okay, well, tell me. I'm sorry? Tell me. So this sand originated out of state, either Arkansas or Oklahoma. The record shows that. All of it? Not all of it, but occasionally – What percentage of it? I don't have – there was no percentage in the record. Because there was no records. There's no – Which were you – again? There's no percentage of how much sand went from one state to another. But that's not what's required. The question is, did the sand originate somewhere else and move its way through interstate commerce and was carried by a native driver? And the answer is unequivocally yes. There's no controverted proof on that. I mean, but how often? Well, again, the – The records don't show. What did the testimony show? That's not reflected in the record, a percentage. But – Okay, so, I mean, the jury could assume, without any production of records of any kind or any testimony of any kind, that it rarely happened. Well, let me just say this. The Barkley did testify that during some period of time towards the end of this, two and a half years perhaps, 10 percent perhaps of the travel was interstate. And you did introduce the International Fuel Tax Agreements that show quarterly fuel purchases, perhaps, I'm not sure, or mileage. What is the significance of the IFTAs on your point? What is that actually showing? I looked at them. It shows mileage, how many to different states. What is that actually telling us? It shows us that this company was engaged in the interstate commerce, that was challenged. Well, that's the conclusion. I mean, what is this document actually trying to reflect? It reflects the number of miles that natives drivers operate per year. I think they're filed quarterly and they're added up. And it's a per year basis of what miles they drove in places other than Texas or other than where an employer would have been based. It's there just as a picture of what this company did. It's one reflection of how it did operate interstate. Regarding this jury instruction, you object to whether the judge gave one example of the various factors you looked to when deciding whether the exemption applied, which would therefore not require payment of time and a half. As I understand it, when you objected to that instruction, you did not propose additional language, such as adding the other factors. Am I wrong in that? That's incorrect. There was no written instruction propounded at that point. Oh, handed to the judge. But there was an objection. There was a statement that these other factors should be included or we should leave the instruction alone. And Rule 51 doesn't require a written instruction to be propounded. But you did say to the judge these other factors should be included. Yes, and that's reflected in our reply brief. I can get a record site for you. I'm going to reserve the rest of my time for rebuttal. Thank you, Your Honor. All right. We're going to hear from you, Mr. Falk. May it please the Court. Good morning. My name is Alan Falk. I represent the plaintiff, Appalese, in this case. How about addressing this? You referred to it as the evidence being destroyed. So how about addressing the fact that they were unable to produce driver's logs and other types of documents? Yes, sir. After we filed our first motion for summary judgment, the defendants came up with this Motor Carrier Act exemption argument. And so we had reset trial deadlines and discovery. So we sent discovery saying, okay, show us the proof of this. We've been litigating this case for some time now, and this just popped up. Give us the bills of lading, which is something talked about by the Fifth Circuit. In these types of cases, it would show concrete evidence of interstate trips. We said, show us the log books. Show us the other documents that show interstate travel. And they didn't produce any. So during trial, I was trial counsel. I asked the president of Native Rural Field Services about those records. With regards to the log books, one of their chief witnesses, Mr. Freddie Lee, who you heard about earlier, said would concretely show out-of-state trips by day, by driver. I showed Mr. Barclay our written discovery request on that. And he said they were not produced, and he said they were destroyed. Now, he, at trial, mentioned the issue that opposing counsel just mentioned about the six-month retention policy. I asked him at trial, and he admitted that they had these written discovery responses well in advance of the time period where they could tell the company don't destroy them, and they didn't do it. When you say tell the company, you mean the third party that held the documents? Yes, sir, which was people. They not only did not tell the company to hold them, they allowed them to be destroyed. There was another type of document Mr. Barclay testified to called a daily trip report, or DTR report, that's mentioned in our brief, which would show by driver's name, by date, the exact start, stop, location, what they did in the given day, where they went. He said those were put in a banker's box, and even though we requested them, and they were put in a banker's box after that, they were destroyed. Now, who destroyed them? I don't know. Wait a minute. He said, I don't know who destroyed them? Well, there's no evidence about who destroyed them. Well, did you ask him? I may have, sir. I don't recall. But the fact of the matter is he knew they were put in a banker's box, and he knew they were destroyed, despite the fact that they had been requested. They were destroyed. According to his testimony, the inference is they were destroyed after they were requested. Yes, sir, and after the defendant should have known there's something that they should produce as concrete evidence to support their claim. But you didn't ask for a spoliation instruction? I did, and Judge Boyle respectfully said the standard is very high for spoliation, and she said that the jury would be able to make its conclusion, based upon the testimony before it, that the records had been requested, that their witnesses testified they would be conclusive on this issue, and they were either not produced or destroyed. Well, actually, they were destroyed. Plain and simple. The one thing you mentioned, I was not sure whether I heard you correctly, and that is that the defense of the MCA exemption for overtime was not raised until after this case had been litigated for a while? Yes, sir. Discovery had been complete. And I guess I should back up. This Motor Carry Act exemption is before the court with our objection to it as being untimely, which we preserved at the trial court level. But discovery had closed. We filed our motion for summary judgment before this defense was even raised. What was their defense? The motor. What was their defense on waiting so long? In other words, what was their defense to the overtime claim before they asserted the Motor Carry Act exemption? That the plaintiffs were just not truthful about working off the clock. Because that's the other thing in this case, Your Honor, and this is another fact that the jury heard. The defendant classified, and the only documentary evidence presented to the jury showing how the defendant classified these drivers, they classified them as non-exempt, meaning due overtime. The jury saw that. The jury also heard Mr. Barclay's testimony that, no, they were all reclassified at a time well before that document was made, which made his testimony rather inconsistent. But their defense was simply they didn't work off the clock. And when that defense didn't work out, they came up with the Motor Carry Act exemption. Because there was never any dispute before that, as can be seen in the original answer, that these drivers were non-exempt. And what is this allegation about a jury instruction that was requested by the defendants of 475 pages of workout sheets? Was that an instruction request or what? Sir, we had 108 plaintiffs and opt-in plaintiffs in this collective action. The defendant wanted the jury, instead of going by the agreed representative testimony and sampling, which the defendants agreed to, in connection with their jury charge, they wanted the jury to go through all the 108 plaintiffs week by week. And this case covered a five-year period, by the way. They wanted them to go week by week over a five-year period, as applicable to each person's relative work period they're in, and calculate the number of overtime hours per week. Based upon precedent from this court, we cited to Judge Boyle that the jury could rely on representative testimony, and that's what the court adopted. All right. But now, as I understand these wage-hour actions of this character, the judge determines the damages after the jury has determined liability? Yes, sir. According to Blagby-Settle-Pew, which so— So why would the jury get the information about the number of hours? They would get the—they would decide the number of hours that are worked, and then, from that information, the district court would calculate the damages. Is that correct? Yes, sir. According to Blagby-Settle-Pew, 2013 case from this court, the jury determines if the workers worked unpaid overtime hours. If so, how many? But ultimately, it's up to the court, as a matter of law, to calculate damages. Regular rate of pay, so forth, liquidated damages. So the jury makes a sample representative finding that the jury is convinced that there were overtime hours worked in this amount? Yes, sir. And then the judge does the specific work? No, sir. The judge takes that number and applies the factors to calculate damages off of that. For example, what is the regular rate of pay that you pay at half-time or time and a half on those unpaid overtime hours? Do you award liquidated damages, which is an equal amount, to the back wages? And the court did that as well. So that's the role of the court after the jury makes that finding. But back to the question, did they submit the workout sheets as a jury instruction, or did they introduce that during the course of evidence, or what? No, sir. It was a jury instruction. And they never introduced it as evidence so that it could be challenged one way or the other? No, sir. They were just blank forms that they wanted the jury to fill out week by week for a seven-year period for 108 people. Oh, I see. Blank forms. Yes, sir. I see. And based upon this court's precedent about representative testimony, sampling to which the defendants agreed to in this case, we pointed out that was not necessary, that there could be a sample taken, and the sample was 5% agreed to by all parties. And of those 5%, by the way, of those agreed representative testimony plaintiffs, not a single one of them testified ever going out of state. But it was from that sample from which the hours were determined, the unpaid overtime hours. Counsel, what do you say on the jury instruction issue that opposing counsel raised? It was the defendants offered instruction, as you point out in your brief, but it seems to me that you then offered either in writing or orally this one sentence to add to it. Let me ask you about that factual point. Did you offer this sentence orally during the instruction conference and the judge accepted it? No, sir. We filed a written motion. Well, we filed it on the jury charge, which included it. Correct, but as far as substituting this one sentence, adding this one sentence, not using your instruction. We're going to use the defendant's instruction. The court decided or at some point does. You offered to add this one sentence. Is that in writing or orally? Yes, sir. It was made in writing pursuant to a motion for reconsideration the day after the court had adopted the defendant's Motor Carry Act exemption charge in its entirety. So you continued the conference with the judge, offered this in writing. There's another hearing that almost simultaneously was getting this. I'm just trying to get to the point of how much notice did the defense have that you wanted to add this one sentence? I believe it was the day of, Your Honor. Okay, so they get this the day of. They don't have any written response to it. Don't they then say, though, at least four of the other factors in an oral response or three of the other factors so that the district judge is aware that they want they don't articulate all of them as they're standing there, but isn't it clear that they want the other factors added? I guess I should back up. I believe we followed our motion for reconsideration the evening before trial, and obviously hours are long during trial. So it wasn't just the morning of notice. But the opposing attorney did mention some of the other factors, but Judge Boyle in her post-verdict ruling correctly noted that the defendants didn't present evidence of those additional factors. Well, but the district judge also said they didn't offer any of the other factors to be added, and I think she was wrong about that, about one of her rulings. Wasn't this a year later when she was making this ruling? It was about nine months later. Okay, it seems to me she may have forgotten that, in fact, the defense counsel had offered some of the other factors in the oral response. Well, Your Honor, they didn't offer all the factors that they're now seeking this court to adopt. What do you say overall about this question? Is it enough? Why would it be enough if there are several factors involved? Why would it be enough just to talk about reasonable expectations and not the rest? Because that was really the only issue before the court in this week-long trial. That was the issue before this court. Well, that was the contested issue of whether they were reasonably expected or not, but that was, to some extent, in deciding whether this was interstate commerce or not, juries needed to weigh all the factors, even if they're not contested and they're not being told all the factors. So it's the contested one, and if you went on that, the fact they're basically aren't even told about the uncontested ones that the defense wins on, it seems out of balance. Well, Your Honor, they wrote this charge. They didn't want any factors in it. As Judge Boyle noted, they wanted none. Because, quite frankly, some of the other factors, and this goes to a question you asked earlier, Judge Southwick, about voluntariness. There is a case about that. It's the case of this court. It's the case argued by my opposing counsel. It's the Allen v. Coyle tubing case. And it's one of the factors, and it's not one that the defendants mentioned at this trial because it wouldn't be good for them, but it's whether the drivers risk termination for refusing trips from dispatch. Voluntariness, basically. Okay. So that wasn't one of the factors they submitted. It seems like you're making my point for me, which is when the jury is deciding whether the driver plaintiffs as a group could be reasonably expected to drive interstate, they need to have everything in front of them, pro and con from your side, pro and con from the defense side, in deciding that. What I'm asking for is, I mean, what is wrong with that understanding of how that fact-finding has to be made? Well, Your Honor, factors that aren't germane to the case probably should not be submitted to the jury. And I think if all these factors were germane, number one, the defendant would have put them in the jury charge, which the court adopted wholesale. And number two, the defendant would have offered them in writing, subsequent to that, or at least argued them orally. Well, they did. They argued orally, and I don't know if they didn't have it all off the top of his head. He mentioned at least three of them, maybe four. I forget the number. You have no doubt you remember the number. Seven. And that's why I was getting to the timing earlier. This was all done the day that this argument was being made. Your Honor, they had a long time to draft their Motor Carrier Act exemption jury charge. The court adopted it. They didn't have a single factor in it. And, Your Honor, under the controlling standard for the court's review for jury charges adopted by the court, I don't think that minor issue rises to the level to reverse the court on its decision here. Well, it is a minor issue in some extent. It's a jury charge. But it's the jury charge on which the key decision in this case turns. And the only factor out of the seven from Allen v. Quill tubing, well, there's probably two. The other one helped me, but we didn't have it in there, the driver's risk termination for refusing trips. Really, the only issue, Your Honor, in this trial was that indiscriminate assignment. Other factors that they don't have any evidence of. Whether and with what frequency project assignments were subject to change. No evidence of that in the record. Whether driver's assignments are distributed indiscriminately. Well, that is an important factor in our case. And that's one of the reasons why Judge Boyle adopted that language from Allen v. Quill tubing and put it in there. But all the other factors just weren't germane, sir. And if they were, the defendant would have put them on the charge. If you have other issues, you can move on. Yes, sir. State what you, the opposing counsel has stated, what he thinks is the test for whether you get the Motor Carrier Act exemption. State what you think the test is. He refers to a class of drivers. State what you think the test is. With regards to the Motor Carrier Act exemption? Yes, sir. When it's applied to an entity like the defendant in this case. Yes, sir. I believe the exemption applies, would apply under the court's holding company-wide if the defendant proves, and that's the other issue, they have to prove it, not me, that there's a reasonable expectation of interstate commerce. Here the jury heard ample evidence to see that there was none from the destruction of multiple records, which would conclusively show one way or the other. You've heard about the IFTA records. The IFTA records, the defendant fails to point out that there were other employees who drove smaller vehicles. And the court's probably aware with the Motor Carrier Act exemption there's a big difference. Well, let me stop you. He stated the test as whether the company drivers, not particular drivers, but the company drivers as a whole belong to a class that engaged in interstate commerce. Now, do you dispute that? I believe that's accurate articulation from Alton. So that being an accurate articulation, then why are you talking about reasonable expectation? Because that's one of the key determining factors on what reasonable expectation is in interstate commerce, and that was the controlling factor in question for this jury to decide. Why was it the key factor? Because there was not a single document showed an out-of-state trip. The defendants came up with this argument after the fact. Not a single plaintiff testified to ever going out of state, although it was an agreed sampling by the plaintiffs and defendants and drivers. The only documents they could muster were these IFTA records that, number one, didn't cover every year worked. I mean, even though this lawsuit, the time period went for five years, they only covered, I think, two years. Many of those records showed no out-of-state travel for long periods of time. They didn't show the weight of the vehicle, which is a key issue in Motor Carrier Act exemption cases because vehicles 10,001 pounds and less aren't subject to the Motor Carrier Act exemption. There were certainly other employees like well-sighted supervisors who drove diesel vehicles that would be smaller weight. So we don't know what the IFTA records showed. They just said mileage and state. Were they these drivers? Were they well-sighted supervisors who were not a part of this class? We don't know, but that's all they had. So if there really was a reasonable expectation, and by the way, we sent a written discovery request asking them to produce documents showing a reasonable expectation of interstate commerce by drivers. Their answer was simply none. The jury saw that. Counsel, let me ask you on reasonable expectation. The way you describe it, and this focus on groups versus individuals, I think, is central to this. If an individual driver had the right to say no, but most drivers didn't exercise such a right, whatever to make of the evidence that comes from the IFTAs about interstate travel during part of this period, if as a group these drivers did occasionally go interstate, would it matter, in your view of the law, that the company, in this disputed evidence, may have said a driver doesn't have to go out of state if he doesn't want to? Yes, sir, because Allen v. Kultubing says that. Number one, one of the factors it talks about is whether drivers risk termination for refusing trips from dispatch. Again, that goes to voluntarians. When I say factor, I'm talking about what's conclusive and what's just a factor. Well, John, I guess I've got to back up to there is really no evidence in the record, concrete evidence as is required, that any driver went out of state. Okay, but you're talking about the evidence here is what the question went to, and it's fine for you to follow up, but I just want to make sure I understand your answer to my question, which is what is the law in this area? And is the mere fact that a driver would be given the right to stand down and not go out of state, is that enough, even if that's given to all drivers? So long as the company generally has drivers go out of state, most of them don't exercise the right to refuse, and so as a group, there is wide interstate traffic? No, Your Honor, because on my notes here, the Fifth Circuit has held that where such activities are trivial, so trivial, casual, or insignificant, as to be de minimis, they won't invoke the Motor Carrier Act exemption, which is, again, while we get back to needing concrete evidence of actual trips, how many, what percentage, et cetera. Whether the trucks weighed a certain amount, whether we're carrying out the intent and the purposes of the Motor Carrier Act. Yes, sir, and there were simply no documents presented by the defense. And all that's supported by documents that you filed with the various agencies, and there were no documents to support any of it, and the testimony of the drivers was contrary to every position, as I understand it, that the plaintiff, I mean, that the defendant asserted. Yes, sir, that's true, and their main witness who tried to say that it did happen, Mr. Freddie Lee, his evidence in support of it was there was a memo that drivers should have an overnight bag. But on cross-examination, he admitted that, well, that could apply to sites in Texas, because sometimes they would work overnight. So if it really happened, they had records, logbooks, DTR records, et cetera, they could have produced. But again, Judge Southwick, with regards to your question about would it affect, if there were a lot of individuals, I guess, who volunteered for it, it might, but that's the key issue. How many were there, or was it de minimis? The defendant could have produced evidence, and it's their burden of proof on this exemption, but they chose not to for some reason. It's also clear, I mean, that if you can establish those factors, your drivers don't have to go out. No driver has to go out every week by any means in interstate commerce. That's true, sir. I mean, you could have 110 drivers, and if they all could go out, and were expected to go out whenever they were requested to do, they may not go out for a month. But if you could prove the other factors, they would still be entitled to the exemption. If they could prove out-of-state trips happened, as you just described, then that would be true. In other months, other course of the year, yeah. Yes, sir. Subject to any other questions, my time has expired. I would ask the Court to affirm the judgment of the District Court. Thank you, Mr. Bogg. Mr. Moore, we hear from you. Thank you. I just did want to point out a couple of things in response to that argument. Mr. Vaught represented that not one single witness testified that they drove out-of-state. I'd urge the Court to look at Mr. Hodkinson's testimony. How do you spell it? H-O-D-K-I-N-S-O-N. That's a driver? That's a driver. Tina McDonald knew of others. What did they say? I'm sorry? What did they say about going out-of-state? Mr. Hodkinson said that he had personally done it. Not one time in 10 years or what? That wasn't part of the record, but it was an admission. Again, we don't know. But it was one in 10 years because the man stored his records. I believe he was only a driver for two years, according to the records. But that gets to a good point. And that circles back to something I mentioned earlier, that frequency is not the issue here. And this all goes back to- But records are. Well, that's not true either, Judge. The issue here- But the jury thought so. They may have, but the jury was not given what they needed to make the proper decision because of the instruction. The issue here is does the Secretary of Transportation have the power to set the qualifications and hours of service of this employee who drove an 80,000-pound truck on our interstate highways? That's the question. That's the ultimate issue here. It's not whether they exercised the authority. It's not whether they could over some but didn't over others. It's do they have the power in a theoretical sense. And the answer is yes. Why? Because this goes back to safety on our interstate highways. It's irrefutable and uncontroverted in the record. This company operated interstate. The DOT, they followed the DOT regs. I'm just going through these factors here. Why was the defense raised then four or five years after this case had been in litigation if that is so central to the nature of the company? I don't think it was four or five years, but also at that time I was not involved in the case. I was not trial counsel. I came in because I have a familiarity with the Motor Carrier Act based on my work in front of this court on the Allen case. I do want to point out a couple of other things. This idea that damages can be sampled, you have to look at the evidence on that. And there was a case that came out, the Tyson case came out. Averaging and sampling is okay now. It wasn't necessarily then. But Tyson also teaches us that, and this is U.S. Supreme Court, that you've got to have some method by which people who aren't injured don't get damages. We don't have that here. What do we have here? We had 92 declarations submitted after the trial was over of all these individuals who say then, oh, gosh, well, I did work this number of hours and I did have this compensation. Why? Because they failed to produce that evidence at trial. What? I mean, the company would have had those records, wouldn't it? That's not the issue. They have to prove their hourly wages plus the number of hours they worked. Then it's up to the judge as a matter of law to figure the damages. But if they can't prove it by company records, then the judge takes their testimony. I mean, it's whatever they want to say almost. Right. Okay. So let's get to that point. To do these averages, the jury heard the drivers say they worked 5, 11, 10, and 13 hours on average. Well, somehow that led to the jury finding that each driver was entitled to 18 hours of overtime. And I don't know about – I'm not that good at math, but I do know that you can't average those numbers and get to 18. So we have an issue with that. That's against the weight of the evidence. This representative thing didn't work. They failed in the proof. It's a fundamental predicate to damages that you have what did they make plus what are the number of hours of overtime. And without that in the record, the judge had no basis to make a damages determination. Well, since the company didn't have the records for whatever we ought to think of that, it does seem to me that statements from the plaintiffs are the only way this case could have proceeded on damages. Is your point that there are not statements in some form from all 90-plus, whatever you said the number was? Or is your statement that the representative sampling under the case law can't be used when you get to the damages? Just what is your ultimate point on what was wrong with the procedure and the evidence on the individual claimant's damages? The procedure was wrong because the evidence was accepted after the verdict. That shouldn't have happened. They realized they had messed up and not put that in the record. Did you ask for discovery on I want every one of these 109 plaintiffs to give me the hours they worked overtime? Probably. I don't know. I can't answer that. I can't answer that directly. But that doesn't matter. You know you must not have. It's their burden. And for the reasons we've discussed today, I'd ask that the court reverse and render unless you have any further questions. Okay. I want to note that yesterday we received a Rule 28J letter from a plaintiff, from you, Mr. Vaughan. I just want to note to counsel that these 28J letters are being abused. We got it yesterday afternoon. It cited a case from last May. Perhaps you discovered it when you were preparing for this oral argument. But not only did you cite the case to us, then you re-argued your case to us. And, you know, when we get these, we have to stop and work on them. And I don't think the purpose of a Rule 28J letter, which is to cite additional authority, is to let you file a SIR reply brief or another brief. And I just want to caution you about misusing these 28J letters. I hope our court is going to do something about that soon. Thank you. Okay. Your Honor, may I say something quickly? Of course. Your Honor, we actually filed the 28J letter last Friday, duly noted on the court's position on our argument, but it was really no different than what the defendants had done with their Rule 28 letters. But we do believe that's a pretty important case from the Third Circuit. No, Mr. Vaughan. You're hurting yourself. They didn't re-argue their case. They cited new authority. And I don't care whether it was filed Friday or yesterday afternoon. That's when we got it through our normal court process. But you re-argued your case after you cited that one case. Yes, sir. And that's just not proper. Okay. That completes the arguments we have on the oral argument calendar for today. The panel stands in recess until tomorrow morning at 9 o'clock. Good job. Yeah, you too.  Yes. Yeah.